IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Cash Management Systems, Inc., Bruce | ) | Civil No. 13-cv-2001 EFM/KGG |
| Lemay, Xell Enterprises,Inc., Allen | ) | |
| Davison, and Richard Herson Mills, | ) | |
| | ) | |
| Defendants. | ) | |

## Complaint for Permanent Injunction and Other Relief

Plaintiff, United States of America, for its complaint against defendants Cash

Management Systems, Inc. (CMS), Bruce William Lemay (Lemay), Xell Enterprises, Inc.

(Xell), Allen Davison (Davison), and Richard Herson Mills (Mills), states as follows:

1.      Defendants promote and implement two fraudulent tax schemes to

employers and employees in the automotive, construction, and trucking industries across

the United States.  The first of these schemes is defendants' tool reimbursement plan,

whereby employers impermissibly recharacterize a portion of their employees' wages as

tool "reimbursements," thereby evading collection and payment of federal income taxes

and federal employment (FICA[1]) taxes.  In conjunction with the tool reimbursement plan,

defendants promote and implement a tool rental or "use" program, through which

employers improperly recharacterize a portion of their employees' wages as tool rental

---

[1] Federal Insurance Contribution Act, 26 U.S.C. §§ 3101, 3111.

7694947.22

payments.  Like defendants' tool reimbursement scheme, the tool rental plan enables employers and employees to evade payment of federal employment taxes.

2.      Defendants' tool reimbursement and tool rental plans are specifically designed, promoted, and sold to employers and employees to evade payment of federal income taxes and federal employment taxes.  Both of defendants' fraudulent schemes are illegal, and defy well-settled propositions of federal tax law and treasury regulations. Between January 1, 2004 and December 31, 2010, defendants' fraudulent tax schemes have cost the U.S. Treasury an estimated $17 million.

3.      The United States brings this complaint pursuant to Internal Revenue Code (I.R.C.) §§ 7402 and 7408 to enjoin defendants and anyone in active concert with them from promoting these tool reimbursement and tool rental schemes and from engaging in any other conduct that interferes with the administration or enforcement of the tax laws.

## Jurisdiction and Venue

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C §§ 1340 and 1345, and I.R.C. §§ 7402(a) and 7403.

5.      Venue in this district is proper based on 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in this judicial district.  Additionally, in organizing, operating, and/or promoting the illegal schemes described herein, each defendant had regular and systematic contacts with residents of this judicial district.  Furthermore, defendant Xell was formed as a Kansas corporation to promote CMS's tool reimbursement and tool rental plans.  Finally, a

number of the witnesses who may be called to testify at trial reside in this judicial district, as do two of the defendants in this case, Lemay and Davison.

**Authorization**

6.     This suit has been authorized and requested by the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, and is commenced at the direction of a delegate of the Attorney General of the United States, pursuant to I.R.C. §§ 7401 and 7403.

**Parties**

7.     CMS was incorporated on September 29, 1999, in the State of Virginia by its founder and Chief Executive Officer, Richard Mills.  Mills hired Bruce Lemay as the President and head of CMS's marketing and sales.  Together, Mills and Lemay hold all the outstanding shares of stock in CMS.

8.     Richard Herson Mills is a citizen of the United States and resides in McLean, Virginia.  Before forming CMS, Mills was a minority shareholder in ProChek, a company that promoted another tool reimbursement arrangement.  Mills left ProChek to start CMS, and provided the capital to form the company.  Mills was responsible for ten to fifteen percent of CMS's original clients, who Mills brought with him from ProChek.

9.     Bruce Lemay is a citizen of the United States and resides in Olathe, Kansas. Lemay graduated from Boston College with a B.A. in English.  Prior to his work with CMS, he was an executive with the Universal Underwriting Insurance Company, where he sold property and liability insurance in the Kansas City area from 1981-1999.

3

10.     On April 26, 1999, Lemay filed articles of incorporation in the State of Kansas on behalf of Xell Enterprises to market CMS's tool plan.  According to IRS records, Xell and Lemay share the same current address.  Xell has only one employee: Lemay's wife, Maggie.

11.     Xell provides eighty-five to ninety percent of CMS's clients.  Xell contracts with sales agents, and Lemay also sells CMS's plans himself.  Xell secured eight new clients in 2008 and at least two in 2009.  Clients are secured through seminars conducted at Trade Association Shows, referrals, and networking.  Xell generally does not advertise the CMS plans, though it ran a promotional piece in Snap-on Tool's "Tech Magazine" in late 2006.

12.     Allen Davison is a citizen of the United States and resides in Overland Park, Kansas.  Davison received his law degree from the University of Nebraska, and became a CPA in 1981.  He has been working with CMS and assisting with the promotion of the tool plans since the company's inception.  Davison is a member of CMS's Board of Directors.

13.     Davison has provided at least four opinion letters in furtherance of promoting CMS's tool plan schemes.  Davison also advised the company on a variety of matters, and CMS eventually put Davison on a $3,000 per month retainer in early 2007. Davison has additionally submitted powers of attorney to represent CMS's clients in several IRS examinations, and submitted appeals of IRS determinations on behalf of some CMS clients.

4

14.     Over the years, Davison has promoted a number of tax-fraud schemes.  On May 11, 2010, the United States District Court for the Western District of Missouri granted a permanent injunction against Davison, barring him from "organizing, establishing, promoting, selling, offering for sale or helping to organize, establish, promote, sell or offer for sale any tax plan, as addressed herein, involving sham parallel C management companies, sham 412(i) plans, [or] sham flock contracts. . . " The Court found that "Davison has promoted several tax arrangements that involve sham companies and bogus deductions. Davison orchestrated these arrangements, including the creation of these companies. Davison knew at the time the companies were created and thereafter that the companies were shams created for the purpose of illegal tax avoidance. Davison did not intend for these companies to be operated in a legitimate fashion and knew that they were not intended by his clients to be operated in a legitimate fashion under the tax code. Nevertheless, Davison has deliberately promoted these arrangements and repeatedly advised his clients that each arrangement is a legal way to reduce tax liability."   The United States Court of Appeals for the Eighth Circuit affirmed the injunction.

### The Mechanics of Defendants 'Fraudulent Tool Reimbursement Scheme

15.     Defendants' clients are employers and employees in the automotive, construction, and trucking industries.  In these industries, it is common for an employer to require its employees to furnish their own tools as a condition of employment. Complete tool sets can be expensive, costing several thousand dollars.

5

16.     Defendants promote and implement a fraudulent tool reimbursement plan whereby employers purportedly reimburse their employees for the cost of the employees' tools, whether those tools were previously acquired or are new purchases.

17.     Upon enrollment in defendants' fraudulent tool reimbursement plan, the employee fills out both an Inventory Form and a New Tool Form.  The Inventory Form provides the employee a one-time opportunity to be reimbursed for all pre-owned tools, including those purchased prior to employment with the employer.

18.     Upon enrollment in defendants' tool reimbursement scheme, an employee's existing wage amount is bifurcated into a wages portion and a tool reimbursement portion.  The allocation is sixty-five percent (65%) to wages, and thirty-five percent (35%) to tool reimbursement.

19.     At defendants' instruction, employer clients treat the tool reimbursement as exempt from federal income tax and federal employment tax withholding.  This results in reduced tax withholding (and thus higher take-home pay) for enrolled employees, and lower employment tax expenses for the enrolled employer.

20.     The following example illustrates how the defendants' tool reimbursement scheme works:  An employee fills out a tool inventory form showing that the amount of his tool inventory is $10,000. Prior to enrolling in defendants' plan, the employee's weekly wages were $1,000.  However, under defendants' plan, the employee's weekly salary is now split, sixty-five percent (65%) or $650 as wages, and thirty-five percent (35%) or $350 as tool reimbursement.

6

21.     With weekly wages of $1,000.00, the employer originally withheld $386.50 from the employee's check for federal employment taxes and federal income taxes,[2] resulting in net pay to the employee of $613.50.  However, under defendants' scheme, the employer only withholds $251.23 from the employee's check on the new wages of $650.00, resulting in net wages to the employee of $398.77.

22.     Defendants charge the employee ten percent (10%) of the $350 tool reimbursement ($35.00), which is deducted from the tool reimbursement, resulting in net tool pay of $315 ($350 – $35).   The employee's total net take-home pay is now $713.77 ($398.77 + $315), which is a net increase of $100.27.

23.     The employee continues to receive purported tool reimbursements of $350 per pay period until the $10,000 of tool inventory cost is exhausted.  In this example, that would be 28.5 pay periods.  Therefore, the employee sees a total increase in take-home pay of $2,857.69 ($100.27 x 28.5 pay periods).

24.     Finally, the employer also benefits from defendants' scheme.  The employer originally paid federal employment taxes on the entire amount of the employee's weekly wages of $1,000, or $76.50.  In this example, the employer now only pays federal employment taxes on the new wages of $650, resulting in payment of only $49.73 in taxes.  Thus, the employer pays $26.77 less in taxes for every pay period in which the employee is enrolled in defendants' tool reimbursement plan.  Defendants

---

[2] Assumes a thirty-one percent (31%) withholding rate for federal income taxes.

charge the employer one and one-half percent (1.5%) of the total tool reimbursements for administering the plan.

### The IRS's Examination of Defendants' Fraudulent Scheme

25.     Once an employee enrolls in defendants' tool reimbursement plan, defendants deal with the employee directly.  Upon enrollment, defendants are responsible for and handle all aspects of the employee's tool inventory, including verifying the cost of the tool inventory, the existence of the tools, the business use of the tool, and whether the tools have been previously depreciated or written off.

26.     Beginning in mid-2008, the IRS examined the federal tax returns of eleven employers who participated in defendants' tool reimbursement and tool rental schemes. Through these examinations, the IRS detected patterns of misconduct that indicate that defendants' tool reimbursement plan operated as a fraudulent tax avoidance scheme, rather than as a legitimate reimbursement plan.

27.     Common findings from the IRS's examination included that (1) defendants did not verify the cost of existing tool inventory with receipts, (2) defendants allowed employees to base the cost of tools in existing tool inventories on estimates rather than actual expense, (3) defendants did not verify whether the employee had previously been reimbursed or depreciated  the tools, (4) defendants permitted employees to list categories of tools rather than creating itemized tool inventories, (5) defendants made no effort to verify the business use of the tools, and (6) defendants made no effort to verify that the tools actually existed.

8

28.     As discussed more fully herein, defendants' fraudulent tool reimbursement plan abuses a provision designed for legitimate reimbursements made by an employer to his employee under the "accountable plan" rules.

29.     The tax code defines gross income as "all income from whatever source derived." I.R.C. § 61(a).  Individuals pay federal income taxes on their adjusted gross income, which is calculated as gross income minus various deductions provided by the Internal Revenue Code. I.R.C. § 62(a).

30.     When Congress passed the Tax Reform Act of 1986, it significantly changed the procedures for deduction of employee business expenses.  It converted most of these expenses into itemized deductions, which a taxpayer could only deduct if the aggregate of such expenses exceeded two percent of the employee's adjusted gross income.

31.     However, the 1986 Act left in place the "above-the-line deduction" permitted by I.R. C. § 62(a)(2)(A) for employees' business expenses incurred by the taxpayer as part of a reimbursement or allowance arrangement ("accountable plans") with their employer.

32.     I.R.C. § 62(a)(2)(A) provides that, for purposes of determining adjusted gross income, an employee may deduct reimbursement for certain business expenses, incurred by the employee in connection with the performance of services as an employee of the employer, which were paid under a reimbursement or other expense allowance arrangement.  However, I.R.C. § 62(c) provides that an arrangement will not be treated as

a reimbursement or other expense allowance arrangement if (1) the arrangement does not require the employee to substantiate the expenses covered by the arrangement to the person providing the reimbursement, or (2) the arrangement provides the employee the right to retain any amount in excess of the substantiated expenses covered under the arrangement.

33.     26 CFR § 1.62-2(c)(1) provides that a reimbursement or other expense allowance arrangement satisfies I.R.C. § 62(c)(1) if it meets the requirements of business connection, substantiation, and returning amounts in excess of substantiated expenses.  If an arrangement meets these three requirements, then a reimbursement paid under the arrangement is treated as having been paid under an "accountable plan." 26 CFR § 1.62-2(c)(2).

34.     Reimbursements paid under an accountable plan are excluded from an employee's gross income, are not reported as wages on the employee's IRS Form W-2, and are exempt from withholding and payment of federal employment taxes. 26 CFR § 1.62-2(c)(4).

35.     Conversely, if the employer's arrangement fails any one of these requirements, reimbursements paid under the arrangement are treated as paid under a *non-accountable* plan.  Reimbursements paid under a non-accountable plan are included in the employee's gross income, must be reported as wages or other compensation on employees' IRS Forms W-2, and are subject to withholding and payment of federal employment taxes. 26 CFR § 1.62-2(c)(3) and (5).

10

36.     Defendants falsely claim that their tool reimbursement plan satisfies the accountable plan strictures, and therefore persuade their clients that by participating in the tool reimbursement plan, employers and employees can exclude the tool reimbursement payments from the employees' gross income, thereby reducing the amount of federal income taxes and federal employment taxes they owe.  Thus, at its purest form, the defendants' tool reimbursement plan is a fraudulent tax avoidance scheme.

### Defendants' Tool Reimbursement Scheme Does Not Qualify as an Accountable Plan

37.     Defendants' tool reimbursement plan fails to satisfy the business connection and substantiation requirements provided by 26 CFR § 1.62-2(d) and (e).

38.     Here, defendants' tool reimbursement scheme fails the business-connection test because employers enrolled in the defendants' tool reimbursement plan reimburse their employees for purported tool expenses regardless of whether those expenses were for tools at all, much less "paid or incurred by the employee [for tools]  in connection with the performance of services as an employee of the employer."  26 CFR § 1.62-2(d)(3).

39.     Under defendants' fraudulent plan, enrolled employers reimburse their employees for their tool inventory, which include tools that were purchased *prior* to the employee's employment with the employer.  Thus, an enrolled employer reimburses an

7694947.22

employee for tool expenses that the employees did not incur in connection with their position with the employer.

40.    Further, defendants do not verify whether enrolled employees have previously depreciated the tools in their inventories or whether the employees were reimbursed for the same tools by a previous employer.  It is axiomatic that employees can only be "reimbursed" for the tools they purchased.  However, under defendants' scheme, employers can reimburse employees for tools for which the employee has already been reimbursed.

41.    Finally, defendants make no effort to confirm that all of the tools in an employee's tool inventory are necessary to his or her work for the employer.  Defendants deal directly with enrolled employees, but defendants do not verify with the employer that the employee is required to own each tool in the employee's inventory as a condition of employment.  Thus, an enrolled employer potentially reimburses employees for tools that the employee was not required to purchase and does not use or need in his work.

42.    Defendants' tool reimbursement scheme also fails the substantiation test because defendants did not require substantiation of enrolled employees' tool inventory expenses as required by 26 CFR § 1.62-2(e)(3).

43.    Under defendants' fraudulent plan, enrolled employees were allowed to submit an Inventory Form, which required the employee to provide the date the tool was purchased, a description of the tool, the cost when the tool was new, and when the tool

was placed in service.  Some version of the Inventory Form also instructed the employees to attach receipts with their enrollment paperwork.

44.     However, in practice, defendants' substantiation process was based entirely of the word of the employee; defendants took no steps to verify or substantiate whether the employee actually incurred tool expenses.  Thus, in some cases, an enrolled employer possibly reimbursed an employee for tool expenses that the employee did not, in fact, incur.

45.     Defendants told the IRS that they changed their substantiation requirements in 2008 in response to Chief Counsel Advice Memorandum 200745018.  Defendants claim that, since 2008, defendants require newly enrolled employees to substantiate their inventory with receipts.

### Defendants' Tool Reimbursement Plan Lacks Economic Substance

46.     Not only does defendants' tool reimbursement scheme fail the accountable plan requirements under 26 CFR § 1.62-2(d) and (e), but it also lacks economic substance.

47.     Under defendants' scheme, purported reimbursement payments are not paid over and above the employees' existing wages.  Instead, employers recharacterize a portion of their employees' wages as tool reimbursement.  Enrolled employees are paid the same amount, pre-tax, as their existing wages prior to enrollment.

48.     In a legitimate reimbursement situation, an employers' reimbursement of its employees' expenses is made out of the earnings of the employer's business.  Thus, the

7694947.22

employer normally has an incentive to demand adequate substantiation to confirm that the reimbursement is limited to "actual business expenditures incurred on the employer's behalf and for the employer's benefit." H.R. Rep. No. 100-998, at 203, 100th Cong., 2nd Sess. (Sept. 28, 1988).

49.    The recharacterization of wages eliminates an employer's incentive to ensure that it only reimburses *actual* expenses that are *necessary* to the employer's business. Under defendants' scheme, employers pay no additional money to their employees, pre-tax, for purported reimbursements.

50.    Defendants' tool reimbursement scheme abuses the preferred treatment for reimbursements made under accountable plans. Under defendants' scheme, employers pay less federal employment taxes on their employees' wages, with a direct benefit to the employers' bottom line. Similarly, employees pay less federal employment taxes and federal income taxes on their wages, resulting in more take-home pay to the employee. These benefits to defendants' clients come at the expense of the public fisc.

51.    Moreover, defendants' tool reimbursement scheme perverts employers' and employees' incentives to ensure expenses are necessary and ordinary to the employers' business. Under defendants' plan, employers bear no additional financial burden for expenses incurred on the employer's behalf and for the employer's benefit: the money for these expenses is simply taken against enrolled employees' wages over time until the expense is fully reimbursed. Thus, the employee has an incentive to purchase a tool he may not actually need to meet the conditions of his employment, and the employer has an

14

incentive to turn a blind eye to ensuring whether the tool expense was incurred at all, or whether it is actually necessary to the employer's business.  Indeed, because employers actually save money (in the form of lower federal employment taxes) when they reimburse their employees by wage characterization, the employer has an incentive to reimburse as many purported tool expenses as the employee can purport to incur.

52.     Finally, the characterization of enrolled employees' wages as purported tool reimbursements undercuts the business-connection requirement provided by 26 CFR § 1.62-2(d).  An enrolled employee is paid the same amount of base pay whether or not he or she is enrolled in the tool reimbursement plan.  The enrolled employee is paid the same base amount whether he claims $1,000 for his tool inventory or $10,000.

53.     If the employee will receive the same amount per hour regardless of the amount of tool expenses being reimbursed, then the reimbursement fails the business-connection test.  If an employer's reimbursement plan pays an amount to an employee regardless of whether the employee incurs a legitimate business expenses, the reimbursement plan does not satisfy the business connection test, and all amounts paid under the arrangement are treated as paid under a nonaccountable plan. 26 CFR § 1.62-2(d)(3)(i).

54.     The Treasury regulations governing accountable plans contain an "anti-abuse provision." 26 CFR § 1.62-2(k).  If a reimbursement plan "evidences a pattern of abuse of the rules of section 62(c) and this section, all payments made under the arrangement will be treated as made under a nonaccountable plan." *Id*.  Under the anti-

7694947.22

abuse statute, defendants' tool reimbursement scheme must be treated as a nonaccountable plan.

## The Mechanics of Defendants' Fraudulent Tool Rental Scheme

55.     Although defendants promote and implement their fraudulent tool reimbursement plan, defendants make significantly more money from their fraudulent tool rental plan, which is the cornerstone of defendants' business.  Defendants contend that payments made under their tool rental plan are not reimbursements paid under an accountable or non-accountable plan.  Instead, defendants falsely claim that tool "use" payments are simply rents paid to the employee for the employer's use of the employee's tools.  As discussed more fully herein, defendants' tool rental plan is simply an illegal tax avoidance scheme.

56.     Before 2004, defendants determined that the average annual retail cost to rent a set of tools in the automotive, construction, and trucking industries exceeded six times the purchase cost of those tools.  By defendants' estimate, if a tool set costs $1,000 to purchase, the annual cost to rent that same set of tools would exceed $6,000.

57.     Defendants used this six-to-one ratio to establish an average tool rental rate of $3.00 per hour.  Defendants' capped the tool rental rate at thirty-five percent (35%) of an enrolled employees gross pay.

58.     As with defendants' tool reimbursement scheme, employees enrolled in defendants' tool rental scheme have their existing wages bifurcated between a wages payment and a purported tool "use" payment.  The allocation is the same as with the tool

16

reimbursement scheme: sixty-five percent (65%) to wages, and thirty-five percent (35%) to tool rental.

59.   Under defendants' tool rental scheme, enrolled employers make lower wage payments to their employees and make up the difference with purported tool use payments to enrolled employees.  Defendants retain one and one-half percent (1.5%) of the employees' tool "use" payment as defendants' fee for administering the fraudulent tool rental plan.  Defendants also collect six percent (6%) of the total purported tool rental payments from defendants' employer clients.

60.   Defendants prepare IRS Forms 1099 for employees enrolled in the tool rental plan, and defendants withhold federal income taxes from the purported tool rental payments.  However, defendants do not withhold any federal employment taxes from the purported tool rental payment.  Neither the defendants nor enrolled employers pay federal employment taxes on the purported tool rental payments.

61.   Employee clients that are enrolled in the tool reimbursement plan are automatically transitioned into defendants' tool rental scheme as soon as the employee's tool inventory expenses are fully reimbursed; however, employee clients are not permitted to partake in both the tool reimbursement and tool rental plans at the same time.  Employees are encouraged to enroll in the tool use plan even if they choose not to participate in the tool reimbursement plan.

62.   Defendants have confirmed that none of defendants' employee clients are in the business of renting tools to anyone else.  Indeed, the enrollment form for

7694947.22

defendants' tool rental plan requires the employees to verify that they are not in the business of renting tools.

63.     As with defendants' tool reimbursement scheme, under defendants' tool rental scheme, employer clients treat the purported tool rental payments as exempt from federal employment tax withholding.  This results in higher take-home pay for enrolled employees, and lower reported wage expenses for the enrolled employer.

## Defendants' Tool Rental Scheme Is Pure Fraud

64.     Defendants' employer clients require their employees to furnish their own tools as a condition of employment.  It is absurd for an employer to require employees to provide their own tools, and to then incur the high cost of renting those tools from the employee.

65.     An employer's participation in the tool rental scheme makes even less economic sense when combined with the tool reimbursement plan.  Under those circumstances, an employer reimburses its employees for the purchase of the tools, and then rents the very tools for which it paid from the employee.

66.     Moreover, defendants' self-imposed cap of thirty-five percent (35%) is meaningless. All except for a handful of defendants' clients' employees received tool rental payments at the thirty-five percent (35%) cap of the employees' wages. Thus, defendants' average tool rental rate of $3.00 per hour was exceeded by all employees that made more than $8.58 per hour. With the specialized skill and training required of employees in the automotive, construction, and trucking industries, most of the enrolled

18

employees' established wages were well above $8.58 per hour before they enrolled in defendants' tool rental scheme.

67.     Defendants' tool rental scheme is premised on the false notion that the tool rental payments are not wages as contemplated by the Internal Revenue Code. However, defendants' fraudulent scheme defies not only economic common sense, but well-settled propositions of federal tax law and explicit regulations to the contrary.

68.     For the purposes of the Federal Insurance Contributions Act (FICA), Federal Unemployment Tax Act (FUTA), and federal income tax withholding (I.R.C. §§ 3121(a), 3306(b), and 3401(a), respectively), wages are defined as all remuneration for employment unless otherwise excluded by another provision of the Internal Revenue Code.

69.     Remuneration for employment is not limited to payments made for work actually performed, but instead includes the *entire* employer-employee relationship for which compensation is paid by the employer to the employee.  *Social Security Board v. Nierotko*, 327 U.S. 358, 365-66 (1946).  For example, signing bonuses paid for establishing employment or severance payments for ending employment are included in wages. Rev. Ruling 2004-109 and 2004-110.

70.     Payments are not wages for the purpose of employment taxes unless the employer can provide clear, separate, and adequate consideration for the employer's payment that is not dependent upon the employer-employee relationship and its attendant terms and conditions.  Rev. Ruling 2004-109 and 2004-110.

71.     In short, if defendants' tool rental payments arise from the employer-
employee relationship, then those payments can only be excluded for the purpose of
federal employment taxes if the tool rental scheme satisfies the accountable plan
requirements.

72.     Defendants steadfastly maintain that their tool rental plan is *not* subject to
the accountable plan rules because the payments are not reimbursements for expenses,
but rather rental payments to enrolled employees for the use of their tools.

73.     However, enrolled employees' use of their tools in the course of their
employment with defendants' employer clients is an inextricable part of the employer-
employee relationship.  Employees need their tools to do their job, and the employers
require employees to provide their own tools as a condition of employment.

74.     Moreover, upon enrollment in the tool rental scheme, employees expressly
affirm that they are not in the business of renting tools.  This affirmation was ostensibly
written to avoid the implications of the self-employment tax; however, is further evidence
that the employees' use of their own tools in the course of their employment is not a
separate and distinct agreement that is wholly divorced from the employer-employee
relationship.

75.     Finally, the substance of a rental arrangement, rather than its form,
determines its true character. *Amerco v. Commissioner*, 82 T.C. 654, 670 (1984).  In
order for an arrangement to be a rental or lease agreement, the property owner must

7694947.22

relinquish control and risk of loss of the property. *Bliss v. Commissioner*, T.C Memo 1985-612.

76.     Enrolled employers and employee clients do not execute a separate lease agreement for the use of employees' tools in the course of their employment.  Under defendants' tool rental scheme, employee clients never relinquish control of their tools, and they never risk the loss of their tools.  Employees are responsible for using and maintaining their own tools while working for their employer.  Thus, the purported tool rental payments are in fact disguised wages subject to federal employment taxes.

## Defendants Made False Statements in Furtherance of
## Promoting and Implementing their Fraudulent Schemes

77.     Defendants have prepared a host of marketing materials and plan documents that falsely claim the propriety of defendants' schemes.  In these materials, provided to defendants' customers, defendants make false and misleading statements with respect to the excludability of tool reimbursements and tool rental payments from income as a participant in defendants' tool plans.

78.     For example, in a letter to tool plan participants, defendants wrote:

Your cost of tools you provide to the job is reimbursed to you tax exempt.  You do not report this reimbursement on your tax return.  **You owe no tax on these payments.**

[…]

**The tool payments for the Use of your tools and equipment (TOOL USE ONLY) are not earnings from a trade or business and are considered "incidental."  Therefore, under code 1402, you are NOT subject to self-**

21

**employment / employment (FICA) tax.  You are <u>NOT</u> required to file Schedule C.**  (emphasis in original).

79.    Other promotional materials state:

"Gross Tool Pay is a business expense reimbursement, so it is a tax exempt DEDUCTION.  Net Tool Pay is after fees, and ADDED back into your pay.  The tax savings is realized from the Income Tax and Employment (FICA / Medicare) Tax exemption." (emphasis in original).

80.    Defendants advertised false benefits of their schemes to technicians

(enrolled employees), including: "Simplified Tax Return – No Need to Itemize Tools.

You Eliminate the Automatic 2% Gross Wage Deductible."

81.    Defendants also prepared and distributed a "Most Common Questions"

hand-out to potential clients.  In this document, defendants falsely claim that the tool

reimbursement and tool rental schemes are legal:

CMS has the support of the foremost accounting and legal tax experts in the country, who have reviewed the program and procedures related to the Tool Program.  In fact, CMS is so confident in the program, if you ever have a tax inquiry about the program, or you are advised to the contrary, CMS will provide expert assistance to you, at no cost.

[…]

Because the Tool Pay is fully or partially exempt from tax, depending on which part of the Tool Program you are participating in at the time, you increase your take home pay.  Our software automatically makes adjustments for any change in the plans.

82.    On June 5, 2006, Bruce Lemay wrote an email to Beth Miller, an enrolled

agent from Massachusetts.  Lemay was responding to a fax that Ms. Miller sent to Brian

O'Riordan, who worked for defendants.  In his response, Lemay falsely stated that employment tax does not apply to tool use payments under the scheme.

**Defendants Knew or Had Reason to Know Their**
**Statements Regarding the Excludability of Tool**
**Reimbursements and Tool Rental Payments from Income Were False**

83.     From inception, defendants knew or had reason to know that their tool plan schemes defied well-settled law and treasury regulations and that their statements about the schemes' supposed tax benefits were false.

84.     In 1999, defendants received a tax opinion from Crowe Chizek which rebutted an earlier, favorable tax opinion.  Defendants were thus aware of criticisms of their schemes from the beginning.

85.     Rather than rethinking or redesigning their scheme, defendants asked defendant Davison to issue a tax opinion regarding defendants' tax schemes.  Between 2000 and 2007, Davison provided his co-defendants with at least four tax opinions.

86.     On February 12, 2000, Davison issued a tax opinion in which he purported to evaluate both the tool reimbursement and tool rental schemes.  Davison's February 12, 2000 opinion cites IRS Private Letter Ruling 9325023, which stated "that if all three requirements are met to qualify as an accountable plan, the amounts paid to the employee are excluded from the employee's gross income."  Davison's opinion further discusses Private Letter Ruling 9325023, noting:

> This letter ruling also provides that an employer may not recharacterize a portion of an employee's salary as being paid under a reimbursement arrangement.

23

7694947.22

However, the reimbursement or expense allowance arrangement provided by an employer should be amounts paid to an employee in addition to salary.

87.     While IRS private letter rulings do not carry precedential value, Davison's discussion of Private Letter Ruling 9325023 in his tax opinion shows that defendants were aware as early as February 12, 2000 that using purported tool payments as wage recharacterization was suspect.

88.     The IRS has issued several revenue rulings relating to tool plans. Defendants rely on Rev. Ruling 68-624 to support their tool rental plan.  However, Rev. Ruling 68-624 was revoked by Rev. Ruling 2002-35.

89.     Indeed, the language of Rev. Ruling 2002-23 is unequivocal:  "payments to employees for equipment they are required to provide as a condition of employment are wages for federal employment tax purposes, unless paid under an accountable plan."

90.     In Rev. Rulings 2004-109 and 2004-110, the IRS clarified that employment encompasses the establishment, maintenance, furtherance, alteration, or cancellation of the employer-employee relationship or any of the terms and conditions thereof.  The revenue rulings further clarified that if the employee provides clear, separate, and adequate consideration for the employer's payment that is not dependent upon the employer-employee relationship and its component terms and conditions, the payment is not wages for purposes of employment taxes.

91.    In  Rev. Ruling 2005-52, the IRS ruled that expense reimbursement plans do not satisfy the accountable plan rules where they use estimated expenses rather than actual expenses to determine reimbursement payments.

92.    As recently as 2008, the IRS has revised its coordinated issue paper on the viability of tool use schemes that do not conform to accountable plan requirements.  *See* Employee Tool & Equipment Plans, LMSB-04-0608-037 (revised July 2, 2008).

93.    Finally, on September 10, 2012, the IRS issued Rev. Ruling 2012-25, which "clarifies that an arrangement that recharacterizes taxable wages as nontaxable reimbursements or allowances does not satisfy the business connection requirement of the accountable plan rules under section 62(c) and applicable regulations."

94.    Defendants knew or had reason to know that their fraudulent tool reimbursement scheme did not meet the requirements of an accountable plan. Defendants implemented and administered the tool reimbursement plan, and defendants were therefore aware that their failure to satisfy the accountable plan rules subjected the purported tool reimbursements to withholding of federal income and employment taxes.

95.    Defendants also knew or should have known that their fraudulent tool rental scheme improperly recharacterized wages as rental payments.  Defendants knew that employees were not in the trade or business of renting tools to their employers, but rather provided and used their own tools as a condition of their employment.  Defendants knew or should have known that enrolled employers were required to treat tool rental payments as wages for the purposes of federal employment taxes.

7694947.22

## Harm to the Government

96.     Defendants' fraudulent tax schemes are similar in that, under both plans, the employer bifurcates its employees' established wages into a labor portion and a purported tool portion.  Both defendants' fraudulent tax schemes achieve the same end: characterizing a portion of the employee's established wages as purported non-wage payments. This helped defendants' client employers and their employees to evade payment of federal employment taxes on the full amount of the employee's wages. Further, tool reimbursement payments under defendants' scheme allow employers to evade federal withholding requirements on a portion of their employees' gross income, and permit those employees to evade paying federal income taxes on the full amount of their wages.

97.     Between January 1, 2006 and September 14, 2009, defendants processed $11,336,154.00 in purported tool reimbursements.  Between January 1, 2004 and December 31, 2010, defendants processed $81,755,601.00 in purported tool rental payments.  Defendants' clients' employers  have paid over $93 million to employees enrolled in defendants' fraudulent schemes without paying proper taxes on these disguised wage payments.

98.     Between January 1, 2004 and December 31, 2010, defendants' fraudulent tax schemes have cost the public fisc an estimated $17 million.

7694947.22

**Count I: Injunction under I.R.C. § 7408 for Violations of I.R.C. §§ 6700 and 6701**

99.     The United States incorporates by reference the allegations contained in paragraphs 1 through 98.

100.    I.R.C. § 7408 authorizes this Court to enjoin persons who have engaged in conduct subject to penalty under I.R.C. § 6700 from engaging in further such conduct if the Court finds that injunctive relief is appropriate to prevent recurrence of the conduct.

101.    Section 6700(a)(2)(A) imposes a penalty on any person who organizes or assists with the organization of a plan or arrangement, or who participates (directly or indirectly) in the sale of a plan or arrangement, and in so doing—makes a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by participating in the plan or arrangement, which that person knows or has reason to know is false and/or fraudulent as to any material matter.

102.    Defendants' tool reimbursement and tool rental schemes are plans or arrangements under I.R.C. § 6700.

103.    Defendants organize or participate in the sale of tool reimbursement and tool rental schemes, and in so doing have made statements with respect to the securing of tax benefits by participation in the plan or arrangement, which (for the reasons described above) defendants know or have reason to know are false and/or fraudulent as to material matters.

27

104.    Injunctive relief is appropriate to prevent recurrence of the tool reimbursement and tool rental schemes and any other conduct subject to the I.R.C. § 6700(a)(2)(A) penalty.

105.    I.R.C. § 7408 also authorizes this Court to enjoin persons who have engaged in conduct subject to penalty under I.R.C. § 6701 from engaging in further such conduct if the Court finds that injunctive relief is appropriate to prevent recurrence of the conduct.

106.    Section 6701(a) imposes a penalty on any person who aids or assists in the preparation or presentation of any portion of a return or other document, knowing or having reason to believe that such portion will be used in connection with any material matter arising under the internal revenue laws, and that, if used, such portion would result in an understatement of the tax liability of another person

107.    Defendants prepared plan documents as well as IRS Forms 1099 for their clients.  Defendants knew or had reason to know that those documents would result in an understatement of the tax liability of tool plan participants.

108.    Injunctive relief is appropriate to prevent recurrence of the tool reimbursement and tool rental schemes and any other conduct subject to the I.R.C. § 6701(a) penalty.

## Count II: Injunction Under I.R.C. § 7402

109.    The United States incorporates by reference the allegations contained in paragraphs 1 through 108.

28

7694947.22

110.   I.R.C. § 7402(a) authorizes a court to issue injunctions as may be necessary or appropriate for the enforcement of the internal revenue laws, even if the United States has other remedies available for enforcing those laws.

111.   As described above, Defendants interfere with the enforcement of the internal revenue laws by promoting and implementing their tax fraud schemes, and by promoting and implementing business or tax services that facilitate noncompliance with federal tax laws.

112.   Defendants have a long history of promoting their two tool plan schemes, detailed at length herein.  In 1999, Crowe Chizek issued a rebuttal of an earlier, favorable tax opinion.  From inception, defendants knew or should have known that their tool plan schemes defied well-settled law and treasury regulations.

113.   Defendants' conduct results in irreparable harm to the United States and the public for which the United States has no adequate remedy at law.

114.   Unless enjoined by this Court, Defendants are likely to continue to engage in such conduct.

WHEREFORE, the United States of America prays for the following relief:

A.   That the Court find defendants have promoted and implemented fraudulent tax schemes which subject them to penalty under I.R.C. §§ 6700 and 6701, and that injunctive relief is appropriate under I.R.C. § 7408 to bar defendants and their representatives, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from further misconduct;

7694947.22

B.      That the Court find that defendants have promoted and implemented fraudulent tax schemes that substantially interfere with the enforcement and administration of the internal revenue laws, and that injunctive relief against them and their representatives, agents, servants, employees, attorneys, and those persons in active concert or participation with them is appropriate to prevent the recurrence of that misconduct under the Court's equity powers and I.R.C. § 7402(a);

C.      That pursuant to I.R.C. §§ 7402(a) and 7408, defendants, and their representatives, agents, servants, employees, attorneys, and those acting in concert with them, are permanently enjoined and restrained from, directly or indirectly, by use of any means or instrumentalities:

(1)      Organizing, promoting, marketing, selling, or implementing the tool reimbursement and tool rental payment schemes that are the subject of the complaint herein;

(2)      Organizing, promoting, marketing, selling, or implementing any program, plan or arrangement similar to the tool reimbursement and tool rental payment schemes that are the subject of the complaint herein;

(3)      Engaging in conduct subject to penalty under I.R.C. § 6700(a)(2)(A), including making or furnishing – in connection with the organization, promotion, marketing, sale, or implementation of a plan or arrangement – any statement about the securing of any tax benefit that they know or have reason to know is false or fraudulent as to any material matter;

7694947.22

(4)     Engaging in conduct subject to penalty under I.R.C. § 6701(a), including aiding or assisting in the preparation or presentation of any portion of a return or other document, knowing or having reason to believe that such portion will be used in connection with any material matter arising under the internal revenue laws, and that, if used, such portion would result in an understatement of the tax liability of another person;

(5)     Organizing, promoting, marketing, selling, or implementing (or helping others to organize, promote, market, sell, or implement) any other plan or arrangement that violates the internal revenue laws or improperly incites taxpayer-customers to evade the assessment or collection of their federal tax liabilities;

(6)     Organizing, promoting, marketing, or selling business or tax services that facilitate or promote noncompliance with federal tax laws;

(7)     Engaging in conduct subject to penalty under any provision of the Internal Revenue Code, or that interferes with the administration and enforcement of the internal revenue laws.

D.   That this Court, pursuant to I.R.C. §§ 7402 and 7408, order Defendants to provide a copy of the injunction to all past and present principals, officers, managers, representatives, agents, servants, employees, and attorneys of the entities used in furtherance of the tool reimbursement and tool rental payment schemes within 15 days of entry of the permanent injunction, and provide to counsel for the United States within 30

31

days a signed and dated acknowledgment of receipt of this Order for each person to

whom Defendants provided a copy of this Order in compliance with this paragraph.

     E.   That this Court allow the United States to engage in full post judgment

discovery to monitor compliance with the injunction;

     F.   That this Court retain jurisdiction over this action for purposes of

implementing and enforcing the final judgment and any additional orders necessary and

appropriate to the public interest; and

     G.   That the Court grant the United States such other and further relief as the

Court deems appropriate.

**Designated Place for Trial**

     The United States respectfully designates Kansas City, Kansas as the place for

trial.

Dated: January 2, 2013         KATHRYN KENEALLY
                               Assistant Attorney General


                               s/Michael R. Pahl
                               MICHAEL R. PAHL
                               Minn. Bar No. 0234539
                               Trial Attorney, Tax Division
                               U.S. Department of Justice
                               P.O. Box 7238
                               Washington, DC 20044
                               Telephone: (202) 514-6488
                               Facsimile: (202) 514-6770
                               Michael.r.pahl@usdoj.gov
                               Attorney for the United States

32

7694947.22

(Intentionally Left Blank)